# THE UNITED STATES DISTRICT COURT
## FOR THE NOTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SEAN CROMIE; JAMES L. STORTZ; :<br>and All Others Similarly Situated,   :<br>                                        :<br>                  **Plaintiffs,**        :<br>                                        :<br>      **v.**                              :<br>                                        :<br>                                        :<br>**LANDIS+GYR TECHNOLOGY, INC.** :<br>**and LANDIS+GYR AG,**                 :<br>                                        :<br>                  **Defendants.**       :<br>_____ : | **Civil Action File No.**<br><br><br><br>**Jury Trial Demand** |

## <u>COLLECTIVE ACTION COMPLAINT</u>
## <u>FOR AGE DISCRIMINATION AND RETALIATION</u>

**COME NOW**, Plaintiffs, Sean Cromie ("Cromie"), James L. Stortz ("Stortz"), and all others similarly situated (collectively "Plaintiffs"), by and through counsel undersigned, hereby file this Collective Action Complaint against the Defendant, Landis+Gyr Technology, Inc. ("LGT"), and Defendant, Landis+Gyr AG ("LG AG"), (collectively "Defendants"), and show the Court, as follows:

-1-

### Introduction

**1.**

Plaintiffs bring this action to remedy a sweeping pattern and practice of unlawful age discrimination and retaliation carried out by LGT, as directed by its parent corporation, LG AG, during a company-wide Reduction in Force ("RIF") executed between December 2024 and March 2025. This case arises from Defendants' implementation of a pre-planned, corporate-level workforce restructuring strategy executed throughout FY2024 and FY2025 using Global Human Resource ("HR") analytics dashboards, age-distribution tracking tools, and organizational-design templates. These tools and corporate priorities, developed months before the March 2025 RIF, demonstrate that the RIF was not based on individualized assessments of performance or skills, but on standardized, top-down workforce redesign initiatives that Defendants knew, or should have known, would disproportionately impact older workers.

**2.**

Senior HR leadership issued a directive to replace "senior leaders" with "younger, global talent." Plaintiffs - - each over 40 and with long, distinguished tenures - - were targeted, undermined, and ultimately, terminated. Their terminations were not isolated events, but part of a coordinated and discriminatory pattern and

practice of purging that disproportionately eliminated older employees, retaliated against those who opposed or questioned the unlawful directives, all the while violating federal protections under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA").

**3.**

Plaintiffs bring this action on behalf of themselves and all similarly situated employees who were swept into this discriminatory age-based RIF, seeking to vindicate their rights and hold Defendants accountable for the systemic misconduct that cost them their careers.

**Summary of Claims**

**4.**

This is a collective action brought by former employees of Defendants alleging violations of the ADEA.

**5.**

Plaintiffs bring this action for unlawful age discrimination and retaliation under the ADEA.

**6.**

Additionally, Cromie brings individual claims for interference and retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), and a breach-of-

contract claim for unpaid Short-Term Incentive Plan ("STIP") and Long-Term Incentive Plan ("LTIP") compensation.

**7.**

Plaintiffs seek back pay, front pay, liquidated damages, lost benefits, and attorneys' fees.

## **Jurisdiction, Venue, Parties, and Joint-Employer Allegations**

**8.**

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the ADEA.

**9.**

Plaintiffs filed Equal Employment Opportunity Commission ("EEOC") Charges, alleging age discrimination and retaliation, more than 60 days before initiating this action. (**Exhibit A**, Cromie EEOC Charge against LGT; **Exhibit B**, Cromie EEOC Charge against LG AG; **Exhibit D**, Stortz EEOC Charge against LGT.)

**10.**

Cromie, age 59, is a former Executive Vice President for the Defendants. (**Exhibit A** and **Exhibit B**.)

**11.**

Stortz, age 64, is a former Senior Director of Hardware Engineering in the Research and Development Division ("R&D"). (**Exhibit D**.)

**12.**

LGT, is a Georgia-based U.S. subsidiary, headquartered in Alpharetta, Georgia. LGT may be served at its principal office address, 30000 Mill Creek Avenue, Suite 100, Alpharetta, Georgia, 30022.

**13.**

LG AG is the Swiss parent entity of LGT. The EEOC Position Statement acknowledges that LG AG is the parent of LGT and directs Global HR strategy. (**Exhibit C**, LG AG and LGT Position Statement, pg. 1.) LG AG may be served at its foreign principal office address, Alte Steinhauserstrasse 18, 6330 Cham, Switzerland.

**14.**

Both Defendants are joint employers and/or the alter egos for one another under the ADEA and FMLA. Defendants operate as a unified enterprise with shared HR, shared executive leadership, shared Board-level oversight, and integrated global management structures. (**Exhibit C**, pgs. 1-2.)

**15.**

Cromie's Employment Agreement expressly required him to report directly to the CEO of LG AG, demonstrating integrated control. (**Exhibit C,** pgs. 2-3.)

**16.**

LG AG, the parent corporation, supervised, directed, or approved the global RIF strategy, the age-based "workforce management" directives, the hiring age targets (35 and under), PowerPoints titled "Replace Senior People with Junior People," and termination decisions involving Plaintiffs. (**Exhibit A** and **Exhibit B**.)

**17.**

Senior Vice President, Global HR executive for LG AG, Thomas John ("John"), directed age replacement to LGT, issued discriminatory statistical targets, and instructed that "senior engineers" be replaced with "younger ones." These directives applied globally and were known company-wide through internal meetings and correspondence to both Plaintiffs. (**Exhibit A** and **Exhibit D**.)

**18.**

The Defendants' own Position Statements admit that LG AG is the global parent, that LGT is part of the Americas Region, that Global HR and executive leadership are shared, and that Global HR controlled key employment decisions. (**Exhibit C**, pgs. 1-4.)

**19.**

Defendants maintain a single unified website, LinkedIn presence, global job posting system, and global executive management structure, demonstrating interrelated operations.[1]

**20.**

Employees of LGT regularly report to executives employed by LG AG, including the CEO and HR leadership.

**21.**

Defendants jointly exercised control over pay, benefits, RIF decisions, corporate restructuring, executive approvals, and the performance expectations used against Plaintiffs.

**22.**

Accordingly, Defendants are correctly treated as joint employers and/or an integrated enterprise for all purposes under the ADEA, FMLA, and federal law.

**23.**

Pursuant to 28 U.S.C. § 1391, venue is proper because Defendants' conduct occurred in the Northern District of Georgia.

---

[1] https://careers.landisgyr.com/?utm_source=CorpSite&utm_campaign=Corporate_Website

**Factual Allegations Common to Both Plaintiffs**

**24.**

In 2023, Defendants appointed John as Senior Vice President and Global HR Executive. John issued directives instructing executive leaders to reduce the average workforce age and replace older employees with younger workers.

**25.**

John and the Defendants implemented a pre-planned, corporate-level workforce restructuring strategy executed throughout FY2024 and FY2025, using Global HR analytics dashboards, age distribution tracking tools, and organizational design templates. These tools and corporate priorities, which were developed months before the March 2025 Reduction-in-Force ("RIF"), demonstrate that the RIF was not based on individualized assessments of performance or skills, but on a standardized, top-down, workforce redesign initiative that Defendants knew, or should have known, would disproportionately impact older workers.

**26.**

Defendants' Global HR leadership published FY2024 corporate priorities identifying "organizational simplification," "span of control alignment," and "workforce management" as mandatory initiatives across business units.

**27.**

This directive was followed by a June 2024 "Workforce Management/ Energizing Performance" program that provided managers with organizational design templates, staffing analysis tools, and training on restructuring principles, including age distribution analysis.

**28.**

At the same time, Defendants' senior leaders - including Global Technology Vice President Amith Kota and all other departmental leaders - regularly used HR analytics dashboards that tracked age distributions by age ranges, average age over time, headcount development, span-of-control metrics, and organizational layering.

**29.**

These dashboards revealed the age profile of each organizational unit before, during, and after the RIF, with the stated goal of reducing the average age of all departments by up to five years following the RIF.

**30.**

Despite having these tools, Defendants performed no age-impact analysis before executing the RIF. As a result, employees aged 45 and older were terminated at a statistically significant rate of approximately 2.42 standard deviations, corresponding to a probability of roughly 0.78% (1 in 129) that the disparity

occurred by chance. Defendants' failure to use readily available age metrics to prevent age-based harm supports an inference of systemic discrimination.

### 31.

These age reduction directives were communicated through executive meetings, Teams calls, PowerPoints, headcount dashboards, and HR communications.

### 32.

In direct reference to the R&D Department, John stated that "a senior engineer costs $140,000.00 - - get two younger ones for $70,000.00," and remarked that the company had "too many older workers" and needed to reduce age demographics through RIFs.

### 33.

The decision-makers responsible for Plaintiffs' terminations were aware of, and acted on these directives from Thomas John and his HR subordinates.

### **Factual Allegations - Cromie**

### 34.

Cromie joined LGT on June 1, 2020, and became Executive Vice President, Americas, on January 1, 2022. He served on the Group Executive Management Team and reported directly to the global CEO. (**Exhibit C**, pgs. 2-3.)

**35.**

In mid-2024, during an Executive Management Team meeting, John delivered a PowerPoint instructing executives to reduce age demographics and replace "older workers" through the upcoming RIF.

**36.**

Cromie objected, stating it was illegal under U.S. law to use age as a factor in employment decisions. His objection caused hostility from Global HR leadership.

**37.**

In November 2024, Cromie developed medically documented, stress-related health issues and applied for FMLA leave on November 21, 2024.

**38.**

On November 20, 2024, Defendants terminated Cromie and promised him full severance and outstanding compensation. Shortly thereafter, Defendants asserted that Cromie's termination was "void" and that he remained employed.

**39.**

On December 9, 2024, while Cromie was on medical leave and medically unavailable for meetings, Defendants terminated him a second time "for cause," based on alleged issues with a 10% financial forecast-- an allegation never before raised with him and contradicted by internal approval processes.

-11-

**40.**

The "for-cause" designation allowed Defendants to avoid paying Cromie over $1 million in severance pay, bonuses, and benefits owed under their Employment Agreement.

**41.**

Defendants also advised the short-term disability carrier that Cromie was no longer employed, resulting in his Short Term Disability ("STD") claim being denied "because we do not have a record of active employment."

**Factual Allegations - Stortz**

**42.**

Stortz began working for LGT in June 2010 and served as Senior Director of Hardware Engineering.

**43.**

In early 2025, Defendants dissolved the Global Technology Office and merged it with the Americas Research and Development ("R&D") division, asserting cost-saving and role-consolidation objectives.

**44.**

On March 19, 2025, Defendants conducted a RIF that resulted in the termination of 46 R&D employees. More than 70% of whom, upon information and belief, were age 40 or older.

**45.**

Younger engineers were retained at significantly higher rates and assumed duties previously performed by older workers, including Stortz.

**46.**

Defendants asserted inconsistent reasons for selecting Stortz, including alleged duplication and salary concerns, though they cited no performance issues.

**47.**

After notifying Stortz of his termination, Defendants accused him of improperly downloading confidential documents - an allegation raised only after he declined to sign a Separation Agreement and used to deny STIP and severance benefits.

### Defendants' "For Cause" Termination of Cromie

**48.**

On December 8-9, 2024, Defendants terminated Cromie "for cause."

**49.**

Defendants now claim the reason was 1) alleged issues with a 10% growth forecast, and 2) alleged failure to respond to CEO Mainz. (**Exhibit C**, pgs. 4-6.)

**50.**

However, Cromie had already had the forecast approved in collaboration with both Finance and leadership.

**51.**

Cromie never prepared any financial forecasts for the Defendants, as Finance created them.

**52.**

Cromie never handled the final approval of any financial forecasts for the Defendants, as upper leadership had the final say on public forecasts.

**53.**

The "for cause" narrative was first created, pretextually, after Cromie 1) opposed age discrimination, 2) raised legal objections, 3) supported other older workers, and 4) took FMLA leave.

**54.**

The termination eliminated a 59-year-old executive with decades of experience and temporarily replaced him with an older executive, while Defendants' age-based RIF policy continued in parallel.

**Post-Termination Events Confirm Pretext**

**55.**

Defendants hired Bain & Company to reassess the forecast following Cromie's termination.

**56.**

The forecast was adjusted, but the Position Statement admits that Bain & Company's analysis was incomplete at the time of Cromie's termination, and thus, played no part in any termination decision. (**Exhibit** C, pg. 6.)

**57.**

Cromie was denied substantial severance and incentive compensation based on the fabricated "for cause" designation.

**Pattern and Practice of Age Discrimination**

**58.**

Defendants engaged in a systemic pattern and practice of age discrimination in selecting employees for termination during the March 2025 RIF. This pattern is

demonstrated by (a) the centralized, HR driven restructuring framework; (b) the use of global workforce planning templates; (c) the uniform application of subjective organizational design criteria; (d) the failure to use objective performance metrics; (e) the disproportionate elimination of older employees; and (f) the availability of age distribution dashboards that Defendants ignored when making termination decisions.

**59.**

At least eleven older employees, all terminated in the same RIF, filed EEOC Charges alleging age discrimination, reflecting consistent experiences of pretextual explanations, subjective selection criteria, and sudden termination despite long tenures and strong performance histories. This volume of identical complaints further demonstrates that the RIF was not the product of isolated decisions but of a systemic practice affecting older workers across the organization.

**60.**

Defendants' RIF decisions followed corporate-level HR directives issued months earlier, including "save money" goals, "organizational simplification" targets, reductions in employee average age, headcount-reduction mandates, and span-of-control targets that disproportionately eliminated senior, higher-paid, and

older employees. Defendants enforced these directives across business units using uniform templates, tools, and reporting dashboards.

**61.**

The approximate statistical disparity produced by the March 2025 RIF - - 2.42 standard deviations against employees aged 45 and older - - constitutes strong evidence of systemic discrimination under Eleventh Circuit precedent and supports Plaintiffs' pattern-and-practice allegations.

**Global Age Discrimination Directives Reaching the R&D Department**

**62.**

Beginning in 2025, the same Global HR directives that affected Cromie also reached the R&D division where Stortz worked.

**63.**

As described in the Cromie Charge and Declaration, Senior Vice President of Global HR, Thomas John issued global directives to 1) reduce average age, 2) replace "senior engineers" with "younger ones," 3) identify "old or obsolete competencies," and 4) increase hiring of employees "35 and under."

-17-

**64.**

Stortz, through leadership communications, internal meetings, and R&D management channels, became aware of these imperatives and observed a shift in hiring, retention, and promotion practices favoring younger employees.

**65.**

These global directives form the backdrop to the R&D reorganization that ultimately targeted and eliminated Stortz, as well as the proposed collective, in the March 2025 RIF.

## R&D Organizational Structure Before the RIF

**66.**

The Americas R&D division consisted of multiple engineering teams, including hardware, mechanical, firmware, and communications engineering.

**67.**

The "Americas R&D Department," led by Vice President Chris Calvert (age 58), and the "Global Technology Office ("GTO")," led by Vice President Doug Jeademann (age 50), operated with overlapping responsibilities and shared resources. (**Exhibit E**, November 11, 2025, LGT Position Statement, pgs. 1-3.)

**68.**

Despite overlapping functions, the departments had survived under prior leadership without consolidation.

**The 2025 R&D Reorganization and Targeting of Older Employees**

**69.**

In early 2025, global leadership decided to dissolve the GTO and merge it with the Americas R&D Department.

**70.**

According to the Position Statement, the stated goal was to "realize at least $20 million in cost savings" and eliminate duplicative positions. (**Exhibit D**, pg. 3.)

**71.**

However, the reorganization disproportionately impacted older workers, and statistical patterns reflect age-based targeting.

**72.**

For example, if the R&D employee was 45 years or older, they had a 20.86% termination rate, whereas employees under 45 had a 10.08% termination rate.

**Statistical Allegations Demonstrating Disparate Impact in R&D**

**73.**

According to the employer's own R&D headcount data (as described in **Exhibit D**), 1) the combined R&D and GTO departments included "292 employees," 2) "46 employees" were terminated on March 19, 2025, and 3) a disproportionately high percentage of those terminated were over 40, including several senior engineers and managers. (**Exhibit F**, Landis+Gyr - List of Employees Affected by the March 19, 2025 Force Reduction.)

**74.**

Upon information and belief, more than "70% of the employees selected for termination were age 40 or older," even though older workers represented substantially less than 70% of the overall R&D workforce. (**Exhibit F**.)

**75.**

Younger engineers - - primarily in their 20s and 30s - - were retained at significantly higher rates.

**76.**

The average age for all combined R&D employees before the March 2025 RIF was 46.77 years, but following the RIF, it reduced to 44.23 years, a 2.54-year reduction. (**Exhibit F**.)

-20-

### 77.

This multi-year reduction (2.54 years) in average workforce age from a single RIF is robust evidence that 1) the RIF disproportionately removed older workers, 2) the Defendants failed to check for disparate impact, and 3) age was functionally a variable in the RIF outcome. (**Exhibit F**.)

### 78.

The average age of the 46 employees terminated was 54.09 years, 10 years higher than the 44.23 average age of the remaining R&D employees. (**Exhibit F**.)

### 79.

After the RIF, younger employees assumed replacement roles and redistributed duties, consistent with John's global targets.

### 80.

The global directives from John to "lower average age," "replace senior engineers," and "hire 35 and under" contradict all pretextual explanations about $20 million in personnel savings and overlapping job responsibilities.

### 81.

The direct evidence, inconsistencies, timing, contradictory evidence, shifting explanations, and substantial statistical disparities all support a convincing mosaic

that Defendants' stated reasons for terminating Plaintiffs were pretextual, and that the real motive was age discrimination and retaliation.

## Convincing Mosaic of Age Discrimination

### 82.

The facts set forth above, taken together, create a convincing mosaic of intentional age discrimination sufficient to support an inference of discriminatory motive under controlling Eleventh Circuit precedent. These facts include the following.

## Direct Evidence of Age Animus

### 83.

John repeatedly directed executives worldwide, including the decision-makers in Plaintiffs terminations to "replace senior people with junior people," "hire workers 35 and under," "constantly review age diversity," "identify old and obsolete competencies," "lacking a certain percentage of 25 to 45 year olds," "senior engineers cost $140,000—get two younger ones for $70,000," "the average age of Landis Gyr is 4 to 6 years above average age for a country, see if we can do something about it," "have an average age of maybe 45 instead of 49," "when people retire, we hire very young people," "we have 55 yo people ding same job for 30 years, replace with less experienced person," "keep younger workforce, we are a

very senior workforce…this is why we have such high personnel costs," "take out expensive people," "if we are too old we run into numerous problems," and "reduce average age" across all departments.

**84.**

These statements and many others were made in executive meetings, PowerPoints, Teams communications, and R&D leadership meetings, constituting direct evidence of discriminatory intent.

**Statistical Disparities Demonstrating Targeting of Older Workers**

**85.**

Employees aged 45+ were terminated at a 20.86% rate, compared to 10.08% for employees under 45. (**Exhibit F**.)

**86.**

This disparity equals 2.42 standard deviations, corresponding to a 0.78% probability (1 in 129) of occurring by chance. In other words, this happens only once in every 129 attempts, making it all but impossible that the outcome was random.

**87.**

The average age of terminated employees was 54.09, nearly 10 years older than the average of retained employees (44.23). (**Exhibit F**.)

**88.**

Defendants' RIF reduced the average age of the R&D workforce by 2.54 years in a single day, evidencing a systemic purge of older employees.

**Pretext Shown by Shifting Explanations and Contradictory Evidence**

**89.**

Defendants gave inconsistent reasons for terminating both Plaintiffs.

**90.**

Cromie's "for-cause" explanation was fabricated only after he opposed age discrimination and requested FMLA leave.

**91.**

Stortz was told his role was duplicative, even though younger engineers were assuming his responsibilities for the first time.

**Global Workforce Planning Tools Showing an Intentional Age Strategy**

**92.**

Defendants tracked average age, age distribution, and headcount by age in dashboards used by Global HR and R&D leadership.

**93.**

Despite tracking age, Defendants conducted no disparate impact analysis before executing the RIF.

-24-

## Temporal Proximity to Protected Activity

**94.**

Cromie objected to unlawful age-based directives shortly before being terminated.

**95.**

Retaliation flowed from the same discriminatory scheme.

## Replacement and Retention Patterns

**96.**

Younger employees with less experience, lower pay, and fewer qualifications were retained and assigned the work of older employees.

**97.**

Taken together, these facts form a compelling and interconnected mosaic supporting the inference that age was the but-for cause of each Plaintiff's termination.

## Cat's Paw Liability Allegations

**98.**

Plaintiffs further allege that Defendants are liable under the Cat's Paw Doctrine, as recognized by the Eleventh Circuit and the Supreme Court.

**99.**

Defendants attempted to remove Thomas John from the decision-making process during the March 2025 RIF because of his age-based remarks and discriminatory attitude, yet kept him on as a high-level HR executive until at least October 2025 and never disciplined him in any manner whatsoever.[2]

**100.**

Moreover, all of John's discriminatory workplace management strategies, PowerPoint presentations, and directives remained in place, with no instructions to subordinates to ignore his prior directives that discriminated on the basis of age.

**101.**

John and Global HR acted with discriminatory animus and sought to eliminate older workers through global RIF directives.

**102.**

John's discriminatory motives influenced, tainted, or directed the decision-making processes used by local executives, including those who participated in the terminations of Cromie and Stortz, as well as the proposed collective.

---

[2] https://www.linkedin.com/in/thomas-john-a66662182/?originalSubdomain=de

**103.**

Decision-makers in the chain of command relied on HR-driven criteria, templates, dashboards, and directives that were themselves infected by discriminatory animus by John and Global HR.

**104.**

Even if the ultimate decision-maker did not personally harbor discriminatory animus, the decision was made in reliance on age-based directives, input, recommendations, or criteria originating from John and Global HR.

**105.**

The RIF's core design - - reducing average age, saving money, eliminating senior talent, and prioritizing "junior" workers - - was conceived and executed by decision-makers with discriminatory intent, making the employer liable for their influence.

**Collective Action Allegations**

**106.**

Plaintiffs bring this action on behalf of all U.S.-based employees aged 40 or older who were terminated as part of the December 2024-March 2025 RIF or pursuant to Global HR directives.

**107.**

Collective members were subject to the same discriminatory policies, including targeted age reduction and replacement of older workers with younger employees.

**108.**

Court-supervised notice is appropriate because collective members are similarly situated and were subjected to a common pattern, practice, and policy of age discrimination and retaliation.

### The Proposed Putative Class

All U.S.-based employees aged 40 and older who were selected for termination as part of the December 2024-March 2025 RIF, or pursuant to any of John's workforce management directives, to the present, are included in this collective.

**109.**

Plaintiffs also bring this collective action pursuant to 29 U.S.C. §§ 16(b), 626(b), for monetary damages and other make-whole relief on behalf of a collective of all terminated employees over the age of 40 and older in the United States and its territories, at any time from November 21, 2024, through the resolution of this action for claims under the ADEA.

**110.**

Plaintiffs and other potential members of the collective are similarly situated in that they were all terminated due to their age, i.e., 40 or above, by Defendants due to policies and practices that have the purpose and effect of denying them employment opportunities because of their age.

**111.**

Similarly, Plaintiffs and other potential members of the collective are similarly situated, in that they have all been intentionally terminated and/or constructively terminated from their employment by Defendants because of intentional, unlawful discriminatory policies and practices that target and eliminate older workers from Defendants' workforce.

**112.**

Many similarly situated collective members would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join it. Notice should be sent to the collective pursuant to 29 U.S.C. §§ 216(b), 626(b).

**Willfulness Allegations (For Liquidated Damages)**

**113.**

As part of its regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the ADEA with respect to Plaintiffs and the collective members.

**114.**

Defendants' violations of the ADEA were willful. Defendants tracked age distribution, average age, and age-range headcounts through HR dashboards but consciously chose not to analyze or mitigate the disproportionate impact of the RIF on older workers.

**115.**

Defendants knew, or recklessly disregarded, that their corporate-level restructuring initiatives for the March 2025 RIF - including FY2024 HR priorities and the June 2024 Workforce Management program - were likely to disproportionately affect older workers because they favored reducing layers, removing senior roles, and achieving cost savings associated with higher-paid, long-tenured employees.

**116.**

Despite this knowledge, Defendants performed no disparate-impact analysis, implemented no safeguards, and executed a RIF that disproportionately removed older workers. Defendants' disregard of their own age tracking data constitutes a reckless disregard of the ADEA's requirements.

**COUNT I – ADEA DISPARATE IMPACT**
**(Age Discrimination in Employment Act - 29 U.S.C. §§ 623(a)(2))**
**(On Behalf of Plaintiffs and All Others Similarly Situated)**

**117.**

Plaintiffs incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs 1 through 116.

**118.**

This Claim is brought by Plaintiffs individually, who are all over the age of 40, and on behalf of all others similarly situated, as defined above.

**119.**

Defendants' RIF disproportionately impacted employees aged 45 and older compared to employees under 45. Specifically, the termination rate for employees aged 45 and older was 20.86%, compared to 10.08% for employees under 45, a disparity of 2.42 standard deviations.

**120.**

Defendants used subjective, unvalidated organizational design criteria - - including "simplification," "span of control," "organizational shape," and "efficiency" - - that correlate with the elimination of senior, higher-paid, and older employees. These criteria were not reasonably designed to evaluate job performance, essential job functions, or productivity.

**121.**

Defendants' HR analytics platforms included age distribution and average age dashboards.

**122.**

Defendants unreasonably failed to use these tools to monitor or prevent age-based adverse impact, despite the presence of clear, measurable age disparities.

**123.**

Defendants cannot show that the RIF decisions were based on "reasonable factors other than age," because they lacked objective criteria, applied subjective factors inconsistently, failed to conduct disparate impact analysis, and ignored age distribution data that they tracked in real time.

**124.**

As a direct result of Defendants' policies and practices, Plaintiffs and members of the impacted group suffered adverse impact in violation of the ADEA.

**COUNT II - ADEA DISPARATE TREATMENT**
**(Age Discrimination in Employment Act - 29 U.S.C. §§ 623(a)(1))**
**(On Behalf of Plaintiffs and All Others Similarly Situated)**

**125.**

Plaintiffs incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs 1 through 116.

**126.**

This Claim is brought by Plaintiffs, individually, who are all over the age of 40, and on behalf of all others similarly situated, as defined above.

**127.**

As shown above, Defendants terminated Plaintiffs because of their ages.

**128.**

Plaintiffs were qualified for their positions and performed satisfactorily, as evidenced by years of exemplary service, bonuses, and awards. And each was terminated under circumstances permitting an inference of age discrimination.

**129.**

Younger, less experienced employees were hired, retained, and/or assumed Plaintiffs' duties, solely because they were younger and could be replaced by 2 or 3 younger workers who, according to Defendants, made the same amount of money.

**130.**

The Plaintiffs' ages were the but-for causes of their terminations, as both were outstanding employees of Defendants and neither had done anything wrong to justify their illegal age-based terminations.

**131.**

The Plaintiffs' ages were the but-for causes of their terminations, as both Plaintiffs have shown direct evidence of age discrimination and strong circumstantial evidence of age-based discrimination from discriminatory remarks by decision-makers, made company-wide, via conference calls, PowerPoints, and Teams meetings.

**132.**

The Plaintiffs' ages were the but-for causes of their terminations, as both Plaintiffs show statistical evidence of age discrimination.

**133.**

Plaintiffs have timely filed Charges with the EEOC and have thus exhausted their administrative remedies. Sixty days have passed since Plaintiffs filed their Charges with the EEOC.

**134.**

Defendants engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against their employees aged 40 and older.

**135.**

Similarly, Defendants engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against older workers ages 40 and older, including treating them differently from their younger peers and using their age as a basis for terminating their employment.

**136.**

Defendants have intentionally discriminated against Plaintiffs and the collective, in violation of the ADEA, by, among other things:

a. Utilizing a biased Workforce Management System that targets its employees, aged 40 and older, for termination;

b. Implementing a Workforce Management System that caused Defendants to discriminate against older workers; and

-35-

c. Systematically and intentionally discriminating against individuals aged 40 or older in its RIF selection throughout the downsizing process.

**137.**

These company-wide policies are intended to, and did, deny Plaintiffs and the collective employment opportunities due to their ages.

**138.**

The discriminatory acts that constitute Defendants' pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

**139.**

Age is not a bona fide occupational qualification for continued employment with the Defendants.

**140.**

As a direct result of Defendants' discriminatory policies and/or practices, as described above, Plaintiffs and the collective have suffered damages, including, but not limited to, lost past and future income, loss of other compensation, and the values of fringe benefits, retirement contributions, health care, and stock options.

**141.**

It is unlawful for any employer to "discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." ADEA, 29 U.S.C. §623(a)(1).

**142.**

It is also unlawful for an employer to "limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the status of an employee, because of such individual's age." ADEA, 29 U.S.C. § 623(a)(2).

**143.**

Plaintiffs are members of a protected class, as employees older than 40 years of age, and at all relevant times were employees of Defendants.

**144.**

Because Plaintiffs were over 40, Defendants took adverse employment action against them solely because of their ages, or terminated them for a fabricated, alleged incident, without complying with or following their own standardized disciplinary measures outlined in their employee handbook. Thus, Defendants treated Plaintiffs differently from other employees because of their ages and because Defendants sought to replace and weed out older workers.

**145.**

Defendant's actions, as outlined herein, are discriminatory toward older workers.

**146.**

Defendants' adverse employment actions against Plaintiffs, and similar adverse employment actions against members of the collective, were undertaken in direct violation of the ADEA, 29 U.S.C. §§ 621, *et seq*.

**147.**

Because of Defendants' company-wide policy of age discrimination, including a *de facto* policy of terminating older workers to reduce the average age of its workforce, Plaintiffs have suffered, and will continue to suffer, irreparable injury.

**148.**

On information and belief, members of the collective have suffered or will suffer similar irreparable injury as a result of Defendants' standard policy of company-wide age discrimination.

**149.**

As a result of Defendants' practices, Plaintiffs, and the members of the similarly situated collective, are entitled to appropriate injunctive relief under 29

U.S.C. §§ 626 (b) and (c) and 29 U.S.C. § 216(b) - - including but not limited to, reinstatement, promotion or hiring back into their rightful positions; an injunction against Defendants use of age as a factor in termination, or layoffs, and subjecting older workers to differing levels of disciplinary tracts than younger workers, and prohibiting further discriminatory conduct toward class members; and any other injunctive relief that the Court deems proper.

## 150.

The foregoing conduct constitutes illegal, intentional age discrimination and unjustified disparate treatment prohibited by 29 U.S.C. § 623(a)(1).

## 151.

As a result of Defendants' intentional, unlawful, and discriminatory practices, Plaintiffs have suffered loss of income, wages, and other benefits and are entitled to liquidated damages.

**COUNT III - ADEA RETALIATION**
**(Age Discrimination in Employment Act - 29 U.S.C. §§ 623(d))**
**(On Behalf of Plaintiffs and All Others Similarly Situated)**

## 152.

Plaintiffs incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs 36, 47-57, 90, and 94.

**153.**

Both Plaintiffs engaged in protected opposition to age discrimination in the workplace.

**154.**

Cromie opposed the Defendants' age discrimination practices, as shown above, and was terminated in retaliation for refusing to implement John's discriminatory plans and for not following along, resulting in Cromie losing valuable severance benefits and his continued employment.

**155.**

Specifically, Cromie, as the Executive Vice President, Americas, refused to implement the company's directive to target older workers, including the R&D Department, and formally complained about it.

**156.**

Stortz and other members of the proposed collective were retaliated against when their bonuses were withheld for not signing the one-sided Separation Agreements, for filing Charges with the EEOC, and for not following along, resulting in them losing their valuable severance benefits.

**157.**

Defendants knew of Plaintiffs' refusals to sign the Separation Agreements and their EEOC filings. Their bonuses were withheld out of retaliation. Many of the potential members of the collective have had their bonus checks, promised in the Separation Agreements, withheld under similar circumstances.

**158.**

The Defendants' illegal retaliation was the proximate cause of Plaintiffs' lost bonuses, wages, and other benefits.

## COUNT IV - FMLA INTERFERENCE
### (Cromie Only - 29 U.S.C. § 2615(a)(1))

**159.**

Cromie was eligible for FMLA leave and requested leave, per his doctor's recommendation, due to a serious health condition. Defendants denied and interfered with Plaintiff's statutory right to leave and failed to restore Plaintiff to the same or an equivalent position, so they are strictly liable to Cromie for violating 29 U.S.C. § 2615(a)(1).

**160.**

Cromie was eligible for FMLA leave based on his years of service, as he had worked for Defendants for more than a year, had worked more than 1,250 hours in

the preceding year, and the Defendants had more than 50 employees within 75 miles of their Alpharetta, Georgia location.

**161.**

Defendants were covered by the FMLA, and Cromie was entitled to FMLA leave.

**162.**

Cromie gave Defendants adequate notice of his intent to take leave before his termination. Defendants and their agents were all on notice of Cromie's health-related problems and his doctor's prescribed leave.

**163.**

On December 9, 2024, Cromie received a termination letter from LGT, signed by Group CEO, Peter Mainz, and by Senior Vice President Global HR, John, advising Cromie that, with approval of the Board of Directors of LG AG, Defendants were terminating his employment "with immediate effect for 'cause' as that term is defined in your employment agreement," supposedly based on alleged "financial improprieties" relating to forecasts under his direction. (**Exhibit C.**)

**164.**

On December 9, 2024, while Cromie was still on approved FMLA leave, and unavailable by phone due to his serious health condition, Defendants, via Peter

-42-

Mainz and John, sent Cromie a letter stating that they had decided to terminate his employment "with immediate effect for 'cause'" and acknowledging "the circumstances of your current medical leave, with your unavailability to talk by phone" as the reason for communicating their decision by email.

## 165.

While out on approved medical leave, Cromie was never contacted by Defendants for any investigatory meeting, interview, fact-finding, or opportunity to respond to the vague allegations of "financial improprieties." Defendants never asked him a single question, never conducted any investigation with him, never asked for any witnesses who would corroborate Cromie's lack of any wrongdoing, and never provided any written details of any alleged misconduct.

## 166.

Defendants' decision to terminate Cromie while he was on protected leave and incapacitated —and without interviewing him or conducting a fair investigation — demonstrates that the purported "for-cause" reason was knowingly false, retaliatory, and pretextual.

**167.**

Cromie was terminated solely on the basis of accusations. He was never allowed to address any such accusations, contrary to the Employment Agreement, basic due process, and Defendants' own internal investigation policies.

**168.**

Defendants denied or interfered with Cromie's FMLA benefits by terminating him, while he was on approved medical leave, thereby removing him from and replacing him in his position as Executive Vice President, Americas.

**169.**

While out on approved leave, the Defendants seized the opportunity to terminate Cromie, failed to hold his position open for him, and failed to restore him to his former position or to an equivalent role.

**170.**

While out on approved leave, the Defendants interfered with his FMLA rights by misclassifying his leave as not allowed under the FMLA or by telling the STD carrier, falsely, that Cromie no longer worked for Defendants and to deny Cromie STD and Long Term Disability ("LTD") benefits.

## 171.

Defendants' misclassification ignored the fact that Cromie had already applied for STD on December 5, 2024, while still employed by the Defendants, before his second termination on or about December 9, 2024.

## 172.

In addition, Defendants went out of their way to notify the STD carrier that it had terminated Plaintiff so that on December 21, 2024, Plaintiff's STD request was denied "because we do not have a record of active employment for you from your employer."

## 173.

As a result of Cromie's termination, in violation of the FMLA, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), Cromie is entitled to liquidated damages equal to the amount of lost wages and benefits because Defendant's violation was not in good faith and was not based on reasonable grounds.

## COUNT V - FMLA RETALIATION
## (Cromie Only - (29 U.S.C. § 2615(a)(2))

## 174.

Plaintiff engaged in protected activity by requesting and taking FMLA leave. Shortly thereafter, Defendant subjected Plaintiff to adverse employment actions,

including termination and denial of compensation, in retaliation for exercising rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(2).

**175.**

Defendants terminated Cromie shortly after he applied for leave, and then denied his request, stating that he was no longer eligible because he was no longer employed.

**176.**

While out on leave, Defendants repeatedly contacted Cromie and became frustrated with him when he asked to be allowed to rest and recover, so Defendants terminated him shortly after he went out on leave, or applied for leave, and then denied his request, stating that he was no longer eligible because he was no longer employed.

**177.**

As shown above, on November 20, 2024, Defendants initially stated that there was no valid reason for Cromie's termination so that he would receive all benefits, but then attempted to reinstate him to avoid paying the severance owed to him.

**178.**

However, on December 9, 2024, in Cromie's second termination, the Defendants explicitly stated that "under the circumstances of your current medical

leave, with your unavailability to talk by phone, we are left with no choice other than to communicate our decision in this matter."

### 179.

In other words, Cromie's medical leave was ignored; the Defendants never asked Cromie about any alleged financial improprieties and completely ignored the FMLA's mandate to honor his leave and keep his position open.

### 180.

As a result of his termination, Plaintiff suffered materially adverse employment actions by losing his position, STD, LTD, salary, bonus, and benefits.

### 181.

Defendants terminated Cromie shortly after he had applied for, and been approved, for medical leave, and after Cromie complained that he was not allowed to rest and recover as his doctor ordered.

### 182.

Defendants terminated Cromie shortly after he applied for leave, and then denied his request, stating that he was no longer eligible because he was no longer employed.

Case 1:25-cv-06962-ELR-RDC   Document 1   Filed 12/05/25   Page 48 of 60

**183.**

Cromie's termination was motivated by FMLA retaliation, as there was no legitimate reason for termination while he was on approved medical leave.

**184.**

As a result of Cromie's termination in violation of the FMLA, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), Plaintiff is entitled to liquidated damages equal to the amount of lost wages and benefits because Defendants' violation was not in good faith and was not based on reasonable grounds.

## COUNT VI - BREACH OF EMPLOYMENT AGREEMENT
### (Bad Faith & Attorneys' Fees)
### (Cromie Only)

**185.**

Cromie and Defendants entered into a valid and enforceable Employment Agreement ("Agreement"), pursuant to which Cromie agreed to provide executive-level services to Defendants, and Defendants agreed, *inter alia*, to compensate Cromie in accordance with the terms of the Agreement, including salary, bonuses, severance, and other contractual benefits.

## 186.

The Agreement constituted a binding contract supported by adequate consideration, and Cromie entirely performed all required obligations or stood ready, willing, and able to perform all duties under the Agreement.

## 187.

Under the express terms of the Agreement, Defendants were obligated to act in good faith and deal fairly with Cromie in the administration, interpretation, and enforcement of the Agreement, including with respect to compensation, termination procedures, and payment of severance and earned benefits.

## 188.

Defendants materially breached the Agreement by, including but not limited to:

a. Failing and refusing to pay compensation, bonuses, and/or severance owed under the Agreement;

b. Terminating Cromie in contravention of the procedures and protections outlined in the Agreement;

c. Arbitrarily and capriciously denying Cromie contractually earned compensation;

d. Misrepresenting the reasons for termination to avoid contractual payment obligations; and

e. Acting in bad faith to deprive Cromie of the benefit of the bargain.

### 189.

Defendants' conduct was willful, vexatious, and undertaken in bad faith, demonstrating a conscious and deliberate effort to avoid its contractual obligations and to financially harm Cromie.

### 190.

Defendants' breach was not the result of negligence or mistake, but rather a knowing and intentional disregard of Cromie's contractual rights, thereby constituting bad faith under Georgia law.

### 191.

As a direct and proximate result of Defendants' breach of the Agreement and bad faith conduct, Cromie has sustained damages, including but not limited to:

a. Unpaid salary, bonuses, and other earned compensation;

b. Unpaid severance and contractual benefits;

c. loss of future earnings and employment opportunities;

d. Consequential financial losses; and

e. Costs incurred in enforcing the Agreement.

**192.**

Defendants' bad-faith refusal to perform their contractual obligations has forced Cromie to retain legal counsel and to initiate this action, entitling Cromie to recover attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11.

**193.**

Defendants' conduct has been stubbornly litigious, has caused Cromie unnecessary trouble and expense, and has been undertaken in bad faith, thereby justifying an award of attorneys' fees and costs under Georgia law.

**COUNT VII - PROMISSORY ESTOPPEL**
**(Cromie Only)**

**194.**

Defendants and their CEO, Werner Lieberherr, made clear, definite, and unambiguous promises to Cromie regarding continued executive employment, compensation, severance protection, and bonus eligibility, including assurances that Cromie would receive the full economic benefits of his Employment Agreement, so long as he continued to perform his duties.

**195.**

Defendants and its CEO, Werner Lieberherr, had both the actual and apparent authority to make these promises, so they are estopped from now denying their effect.

-51-

**196.**

Defendants reasonably should have expected that these promises would induce action or forbearance on the part of Cromie, including continued loyalty, performance of executive services, and the decision not to pursue alternative employment opportunities.

**197.**

Cromie reasonably, and detrimentally, relied upon Defendants' promises by continuing to work for Defendants, foregoing other professional opportunities, and remaining bound to Defendants' organization.

**198.**

Defendants breached their promises by terminating Cromie, on November 20, 2024, and again on December 9, 2024, and by refusing to provide the compensation, severance, and bonuses promised and reasonably expected by Cromie.

**199.**

As a direct and proximate result of Defendants' broken promises, Cromie suffered substantial financial damages, including loss of salary, bonuses, and benefits exceeding $1,064,432.

**200.**

Injustice can only be avoided by enforcement of Defendants' promises, and equity therefore requires that Defendants be held liable for the damages caused by Cromie's reasonable reliance.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against the Defendants, as follows:

### Collective Action for Age Discrimination and Retaliation

(a)    That Defendants be permanently enjoined from discriminating and retaliating against Plaintiffs, on any basis whatsoever;

(b)    That Defendants be ordered to formulate, distribute, and implement a written policy which does not discriminate or retaliate against the Plaintiffs in any manner, which is a violation of the ADEA:

(c)    That Defendants be ordered to compensate, reimburse, and make whole the Plaintiffs for all the benefits they would have received had it not been for Defendants' illegal actions, including but not limited to pay, benefits, incentives, stock shares, retirement, bonuses, raises, promotions, and seniority;

(d)    That Plaintiffs recover liquidated damages for Defendants' willful violations of the ADEA:

(e)  That Plaintiffs recover costs and expenses of litigation, including an award of reasonable attorney's fees;

(f)  That Plaintiffs recover prejudgment interest;

(g)  That this Court issue a declaratory judgment that the practices complained of are unlawful and void; and

(h)  For such other and further relief as this Court deems just and proper.

### Cromie's Claims under the FMLA and Retaliation

(a)  That Defendants be permanently enjoined from discriminating and retaliating against Cromie in violation of the FMLA on any basis whatsoever;

(b)  That Defendants be ordered to formulate, distribute, and implement a written policy which does not discriminate or retaliate against Cromie, in any manner, which is a violation of the FMLA;

(c)  That Defendants be ordered to compensate, reimburse, and make whole Cromie for all the benefits he would have received had it not been for Defendants' illegal actions, including but not limited to pay, benefits, incentives, stock shares, retirement, bonuses, raises, promotions, and seniority;

(d)    That Cromie recover liquidated damages for Defendants' willful violations of the FMLA:

(e)    That Cromie recover costs and expenses of litigation, including an award of reasonable attorney's fees;

(f)    That Cromie recover prejudgment interest;

(g)    That this Court issue a declaratory judgment that the practices complained of are unlawful and void; and

(h)    For such other and further relief as this Court deems just and proper.

## Cromie's Claims under Breach of Contract and Promissory Estoppel

As a direct and proximate result of Defendants' breach of the Employment Agreement and their unfulfilled promises, Cromie has sustained substantial damages, including but not limited to the following:

**(a)    Contract Damages (Breach of Employment Agreement).**

Plaintiff has suffered loss of compensation for being terminated without cause, expressly guaranteed under the Employment Agreement, including;

- $480,000.00 severance;

- $336,000.00 STIP;

- $250,000.00 LTIP;

- $50,000.00 benefits continuation; and

- Along with any other employment benefits, in a total amount exceeding $1,116,000.00, representing the economic loss caused by Defendants' wrongful termination and refusal to honor their contractual obligations.

**(b)    Expectation Damages.**

Cromie is entitled to recover the full benefit of the bargain, including all compensation and benefits he reasonably expected to receive but for Defendants' breach, including future earnings and contractual severance protections.

**(c)    Reliance Damages (Promissory Estoppel).**

In the alternative, Cromie is entitled to recover all losses incurred in reasonable reliance upon Defendants' promises, including loss of income, lost career opportunities, and economic detriment suffered by remaining employed with Defendants instead of pursuing alternative employment.

**(d)    Consequential Damages.**

Cromie has suffered additional financial losses flowing naturally from Defendants' breach and broken promises, including loss of retirement contributions, health benefits, stock shares or offerings, and other employment-related compensation.

**(e)**    **Bad Faith Damages and Attorneys' Fees.**

Defendants' willful and bad faith refusal to comply with their contractual and promised obligations entitles Cromie to recover attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11.

**(f)**    **Prejudgment and Post-Judgment Interest.**

Cromie is entitled to interest on all amounts due and owing from the date of breach,  on November 20, 2024. Cromie seeks interest from the date the loss accrued (November 20, 2024) at the legal rate of 7% per annum simple interest pursuant to O.C.G.A. § 7-4-2, on the amount of damages owed, until paid in full.

## Jury Demand

Plaintiffs herein demand a trial by jury of all issues in this action.

Dated this 5th day of December 2025.

**PANKEY & HORLOCK, LLC**

By:   */s/ Larry A. Pankey*
    Larry A. Pankey
    Georgia Bar No. 560725
    ***Attorneys for Plaintiffs***

1441 Dunwoody Village Parkway
Suite 200
Atlanta, Georgia 30338-4122
Telephone:   770-670-6250
Facsimile:    770-670-6249
LPankey@PankeyHorlock.com

## CERTIFICATION OF FONT SIZE

Pursuant to Local rule 5.1(C) of the Local Rules of the United States District Court for the Northern District of Georgia, I, Larry A. Pankey, of Pankey & Horlock, LLC, attorney for Plaintiffs, Sean Cromie and James L. Stortz, hereby certify that the foregoing **Collective Action Complaint for Age Discrimination and Retaliation** is typewritten in MS Word using Times New Roman font, fourteen (14) point type.

Dated this 5th day of December 2025.

**PANKEY & HORLOCK, LLC**

By:   */s/ Larry A. Pankey*
      Larry A. Pankey
      Georgia Bar No. 560725
      ***Attorneys for Plaintiffs***

## THE UNITED STATES DISTRICT COURT
## FOR THE NOTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SEAN CROMIE; JAMES L. STORTZ; and All Others Similarly Situated, | : : : | |
| Plaintiffs, | : : | Civil Action File No. |
| v. | : : : | |
| | : | Jury Trial Demand |
| LANDIS+GYR TECHNOLOGY, INC. and LANDIS+GYR AG, | : : : | |
| Defendants. | : : : | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing **Collective Action Complaint for Age Discrimination and Retaliation** with the Clerk of Court using the CM/ECF system.

Dated this 5th day of December 2025.

**PANKEY & HORLOCK, LLC**

By:  /s/ *Larry A. Pankey*
     Larry A. Pankey
     Georgia Bar No. 560725
     ***Attorneys for Plaintiffs***

-59-

1441 Dunwoody Village Parkway

Suite 200
Atlanta, Georgia 30338-4122
Telephone:   770-670-6250
Facsimile:    770-670-6249
LPankey@PankeyHorlock.com